AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 21-SW-168 |
| IN THE MATTER OF THE SEARCH OF TWO DEVICES | ) | |
| CURRENTLY IN CUSTODY OF THE METROPOLITAN | ) | |
| POLICE DEPARTMENT UNDER RULE 41 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1). | Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a |
| 21 U.S.C. §§ 841(a)(1) and | Crime Punishable by Imprisonment for a Term Exceeding One Year. |
| 841(b)(1)(D). | Unlawful Possession with Intent to Distribute a Controlled Substance. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Officer, James Jacobs, Metropolitan Police Department
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ *(specify reliable electronic means).*

Date: _____06/08/2021_____

_____
*Judge's signature*

City and state:  Washington, D.C.

Zia M. Faruqui, United States Magistrate Judge
_____
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-SW-168 |
| | ) | |
| IN THE MATTER OF THE SEARCH OF TWO DEVICES | ) | |
| CURRENTLY IN CUSTODY OF THE METROPOLITAN POLICE | ) | |
| DEPARTMENT UNDER RULE 41 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 22, 2021 _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 06/08/2021 _____          _____
                                                                                                                              *Judge's signature*

City and state: _____ Washington, D.C. _____          Zia M. Faruqui, United States Magistrate Judge
                                                                                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-SW-168 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

*Property to be searched*

The property to be searched is two Devices seized from Anthony Nico Bailey on the date

of his arrest, April 27, 2021, currently located at the Metropolitan Police Department's Evidence

Control Branch, 17 DC Village Lane SW, Washington, DC 20032:

1. Apple iPhone with MPD property control barcode #11008159

2. Apple iPhone with MPD property control barcode #11008160

## **ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), and 21 U.S.C. § 841(a)(1) and § 841(b)(1)(D) (Unlawful Possession with Intent to Distribute Marijuana), as described in the search warrant affidavit, including, but not limited to:

a.   Information relating to the Suspect's location and/or activities when the Offense occurred and during the periods of time reasonably before and after the Offense;

b.   Information relating to the Suspect's possession and acquisition of the firearm that was recovered in this case;

c.   Communications relating to the Offense, including any communications among accomplices who helped facilitate or participated in the Offense and witnesses;

d.   Information relating to the Suspect's knowledge of and relationship with victims or witnesses to the Offense, and their knowledge of and relationship with each other and the Suspect;

e.   Information relating to the Suspect's, any victim's, or any witness's knowledge of or presence at the crime scene or another location relevant to the Offense;

f.   Information relating to the Suspect's motive and/or intent to commit the Offense;

g.   Information relevant to any victim's or witness's identification, including the Suspect's or accomplice's distinguishing characteristics (such as hairstyle, tattoos, and clothing);

h.  Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

i.  Passwords, encryption keys, and other access devices that may be necessary to access the Devices;

j.  Records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, and records of or information about Internet Protocol addresses used by the Devices;

k.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, images, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF TWO DEVICES CURRENTLY IN CUSTODY OF THE METROPOLITAN POLICE DEPARTMENT UNDER RULE 41** | **Case No. 21-SW-168** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, James Jacobs, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two digital devices recovered directly from an indicted defendant on the date of his arrest pursuant to a search warrant—which are currently in law enforcement possession ("iPhone 1" and "iPhone 2" – collectively, the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am an Officer of the Metropolitan Police Department ("MPD") in Washington, D.C., and have been employed by MPD since May of 2013.  I currently serve as a member of the Gun Recovery Unit with Narcotics and Special Investigations Division.  As a police officer, I have participated in hundreds of arrests related to firearms and narcotics. In addition to this, I have participated in the execution of over 200 search warrants pertaining to firearms and other violent offenses.  I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws.

3

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      On April 30, 2021, a federal grand jury of the District of Columbia returned a 2-count indictment against Anthony Nico Bailey ("Bailey" or "the defendant") on violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) (Unlawful Possession with Intent to Distribute a Controlled Substance) ("Subject Offenses").

5.      Based on my training and experience and the facts as set forth in this affidavit, and per the grand jury's indictment, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) and 21 U.S.C. § 841(a)(1) and § 841(b)(1)(D) have been committed by Bailey.  There is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

1.      The property to be searched is an Apple iPhone with unknown IMEI number and MPDC property control barcode #11008159; and an Apple iPhone with unknown IMEI number and MPDC property control barcode #11008160.

49.     The Devices were both recovered directly from the address where Bailey was residing as officers executed a search warrant and arrested him, which is also Bailey's last known address with the Pretrial Services Agency.  Specifically, both Devices were recovered from

bedroom 1, where Bailey had multiple forms of mail matter and a lot of his clothing, where Bailey had recently filmed multiple Instagram videos, and where a firearm was recovered on the date of arrest that Bailey had previously displayed on Instagram from bedroom 1.  When the officers entered to execute the search warrant, moreover, Bailey said something along the lines of "everything in the house is on me."  Bailey has since been indicted based on the firearm and controlled substances recovered from bedroom 1 on the date of the arrest.

2.      The Devices are currently located in MPD custody at MPD's Evidence Control Branch, 17 DC Village Lane SW, Washington, DC 20032.

## PROBABLE CAUSE

3.      On April 19, 2021, the Honorable Jonathan Pittman, Associate Judge for the Superior Court of the District of Columbia, issued a search warrant (2021CSWSLD1297) for the residence at 3055 30th Street SE #3, Washington, DC, 20020, finding probable cause to believe that "[f]irearms, ammunition, firearm accessories, [and] proof of residency" were concealed therein.

4.      The affidavit supporting the application for the search warrant was prepared by Officer Nicholas Damron, your Affiant's fellow member of the Gun Recovery Unit in MPD's Narcotics and Special Investigations Division.  Officer Damron's affidavit detailed how on dates including January 10th, 2021, February 10th, 2021, March 31st, 2021, April 3rd, 2021, April 5th, 2021, and April 17th, 2021, Officer Damron had viewed videos on the application known as Instagram posted by the account "1str8cashahk" which he believed to be controlled by Anthony Bailey.  Officer Damron further detailed how, on each of those videos, Bailey was observed displaying firearms and ammunition, and how he was able to identify the filming location of the

videos as 3055 30th Street SE #3, Washington, DC 20020, Bailey's last known address with the Pretrial Services Agency.

5.      On April 27, 2021, your Affiant along with Officer Damron and other members of the NSID Gun Recovery Unit, executed the search warrant at 3055 30th St SE #3, Washington, DC, 20020.  Officers made entry into the residence at approximately 0638 hours, while shouting "Police, Search Warrant."  After officers made entry into the location, the defendant was observed standing in the living room shirtless and had only boxers on.  While Bailey was on the ground, Bailey said something along the lines of "everything in the house is on me."  A female who identified herself as a significant other of Bailey was located on a bed inside of bedroom 1. Bailey's mother and sister were also at the address, but not in bedroom 1.  Bailey had multiple forms of mail matter inside bedroom 1 and eventually put on clothing that was from inside of bedroom 1.

6.      In the course of the search of bedroom 1, where Bailey's mail matter and clothing were, officers recovered:

Item 1: A Springfield Armory XD .45 ACP semi-automatic handgun with a laser (Serial# S3291715) with one cartridge of ammunition in the chamber and five cartridges of ammunition in the magazine. The handgun was recovered from the floor right next to the bed inside of bedroom 1.

Item 2: Four plastic bags containing 199.1 grams of a green weed substance (Field tested positive for the presence of THC) recovered from the floor next to the bed inside of bedroom 1.

Item 3: $1406.00 US Currency recovered from the floor area next to the bed inside of bedroom 1. Item 3 was right next to/ on top of item 2.

**Item 4: Cell phone recovered from the bed area inside of bedroom 1.**

**Item 5: Cell phone recovered from the bed area inside of bedroom 1.**

Item 6: A Glock 42 .380 caliber semi-automatic handgun (serial # AAYR148) with zero cartridges of ammunition in the chamber and nine cartridges of ammunition in the magazine. The handgun was recovered from a shoe box which was located in a duffle bag inside of the closet in bedroom 1.

Item 7: A box of 9mm ammunition containing 26 rounds of ammunition recovered from inside of bedroom 1.

Item 8: A box of 9mm ammunition containing 17 rounds of ammunition recovered from inside of bedroom 1.

Item 9: One plastic bag containing 16.1 grams of a green weed substance (field tested positive for the presence of THC) recovered from the night stand in bedroom 1.

Item 10: A clear plastic bag containing 11.7 grams of a green plant material which was consistent with that of Synthetic Cannabinoids recovered from the inside of bedroom 1.

Item 11: Two cartridges of .40 caliber ammunition recovered from inside of a purse inside of bedroom 1.

Item 12: Thirty three small jars containing a green weed substance (field tested positive for the presence of THC) and two empty jars.

Item 13: A 9mm magazine with a capacity of twelve rounds of ammunition and no cartridges of ammunition inside of the magazine.

7

Item 14: Eleven bags containing THC edibles recovered from inside of bedroom 1.

7.      Officer Damron recognized Item #1 as one of the firearms he had previously seen Bailey in possession of inside bedroom 1 on Instagram.

8.      There are no firearm or ammunition manufacturers in the District of Columbia. Therefore, the firearm and ammunition in this case would have traveled in interstate commerce prior to being recovered in the District of Columbia.

9.      Defendant Bailey was placed under arrest.

10.     Bailey does not have a license to carry a firearm in the District of Columbia. A WALES/NCIC check revealed that Bailey does not have a firearm registered to him in the District of Columbia.

11.     A criminal history check of Bailey through the National Crime Information Center (NCIC) confirmed that Bailey entered a guilty plea to Carrying a Pistol Without a License While On Release in 2016 in D.C. Superior Court case 2015CF2010887. Bailey was sentenced to 8 months' incarceration and one year of supervised release. Bailey would have been aware at the time of his arrest in this case that he had a prior conviction for a crime punishable by more than one year.

12.     The two Devices recovered from bedroom 1, which were listed as Item 4 and Item 5 on the seizure list, were Apple iPhones. The two Devices were given MPD property control barcode numbers "11008159" and "11008160," respectively, and placed on NSID evidence book 2723, page 66 as "iPhone with case" and "green iPhone with case."

13.     On April 28, 2021, Bailey was charged by complaint in the District of Columbia with the Subject Offenses.

14.     On April 30, 2021, a Grand Jury in the District of Columbia indicted Bailey on the Subject Offenses.

15.     On May 13, 2021, the Honorable Robin M. Meriweather issued a search warrant on the Instagram account "1str8cashahk" associated with user Bailey.  On May 14, 2021, NSID Officer Marta Spajic served the search warrant.

16.     In the search warrant returns for Bailey's Instagram account, several items of note appeared in the direct messages.    On February 16, 2021, Bailey messages username "barbarasongmg" and advises him "I got 2 phones."  There is probable cause to believe that both Devices listed in this affidavit and recovered from Bailey's bedroom do in fact belong to Bailey.

17.     The direct message portion of Bailey's Instagram account also include communications involving the illegal trafficking of firearms and ammunition and the distribution of controlled substances.  The following provides some examples, although not an exhaustive list, of references to firearm trafficking discovered in the Instagram findings.

     a.  On February 20, 2021, Bailey is messaging Instagram user "doubleback.riq" and discussing providing a firearm and magazine of ammunition for a firearm to him. When he advises "doubleback.riq" that he is just waiting to acquire the magazine for the firearm before providing it to him, "doubleback.riq" advises that he already had a "50" (referring to a 50 round drum magazine/ high capacity feeding device), he just needs another gun.

     b.  On March 19, 2021, Bailey messages Instagram user "gm.rocko" and says, "See if you can find me a Glizzy, Tryna buy one I got 800."  Based on your Affiant's training and experience, the term "Glizzy" is a commonly used slang

term for "gun."  Bailey and "gm.rocko" continue discussing the price and agree to try and acquire the firearm for $700 if possible.

c.  From March 25, 2021 to March 26, 2021, Bailey is exchanging messages with Instagram user "souljaa_otg" about meeting up. Bailey tells "souljaa_otg" that he is trying to get another handgun before meeting and advises "souljaa_otg" "I still got you."   Your Affiant understands Bailey to be saying that he is planning to provide this firearm to "souljaa_otg."

d.  On March 28, 2021 and March 29, 2021, Bailey exchanges messages with Instagram user "_.moneymakingjit," discussing selling him a .45 caliber Ruger handgun for $800. "_.moneymakingjit" asks Bailey whether he has any other guns available in the $600 price range, to which Bailey responds "Not right now," implying that he has a varying selection of guns available for purchase depending on the time.

18.  Bailey also has numerous messages with different Instagram accounts centered around selling pills.  The following provides some examples, although not an exhaustive list, of references to narcotics trafficking discovered in the Instagram findings.

a.  On May 13, 2021, Anthony Bailey is exchanging direct messages with Instagram user "souljafromsimp" discussing selling 500mg pills for $30 and 600mg pills for $40.

b.  On March 9, 2021, Anthony Bailey messages Instagram user "bigtreypound" about selling him pills for $25 a pill.

c.  On April 1, 2021 and April 2, 2021, Anthony Bailey reaches back out to

Instagram user "bigtreypound" and advises him that he has "RP10s" available. Based on your Affiant's training and experience, this is a reference to oxycodone hydrochloride pills, which are white in color circular shaped pills with "RP10" imprinted on them and are a schedule 2 controlled substance under the Controlled Substance Act.

The Devices are currently in the lawful possession of the MPD and stored at MPD's Evidence Control Branch, 17 DC Village Lane SW, Washington, DC 20032.  The Devices came into the MPD's possession after officers executing a search warrant at Bailey's residence on the date of Bailey's arrest seized the cell phones from Bailey's apparent bedroom and logged them into evidence.  I seek this additional warrant to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

19.    Based on the foregoing facts and indictment, your affiant submits that there is probable cause to believe that Bailey violated the Subject Offenses and that the Devices contain evidence, fruits, and instrumentalities of the Subject Offenses.  The evidence may be relevant to proving the acts and elements of the criminal conduct charged, Bailey's motives, intent, preparation, or planning in connection with those actions, and may provide evidence of unidentified coconspirators.

20.    There is probable cause to believe that the Devices contain attribution evidence showing that Bailey was the owner and user of both Devices.  Based on my training and experience, I know that a cell phone generally contains information which can indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, electronic

11

communications, lists of contacts and calendar entries, social media account information, and images or video recordings – plus data associated with the foregoing, such as date and time – may indicate who used or controlled the device at particular times. From training and experience, I also know that a cell phone often contains images, video recordings, and audio recordings of the cell-phone user and his close associates. These may reveal or confirm distinguishing characteristics – such as voice, tattoos, clothing, vehicle, and hangouts – that may help identify them. Here, as noted, Bailey has stated in Instagram messages that he has two phones. Moreover, both phones were recovered from his apparent bedroom, where his mail matter and clothing was located, where he has previously filmed Instagram videos, and where his Springfield Armory XD .45 firearm was recovered, which he has previously displayed on Instagram from bedroom 1.

21.     There is probable cause to believe that the Devices, which are smartphones, contain locational information about Bailey's whereabouts in connection with his commission of the Subject Offenses, including where he has been in possession of or otherwise engaged in transactions of firearms and narcotics. Based on my training and experience, I know that people who commit crime in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (*e.g.*, GPS data), app usage information (*e.g.*, Internet search inquiries), and images or video recordings relevant to the criminal activity. Furthermore, I know from training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.

22.     There is probable cause to believe that the Devices contain communications about the Subject Offenses and thus of the identities of unidentified potential co-conspirators and facilitators.  Evidence of prior communications, coordination of efforts, or planning in the form of text messages, exchanged videos or images, or voicemails are all relevant evidence that would tend to show violations of the Subject Offenses.  Based on my training and experience, I know that victims, witnesses, and perpetrators of crime in Washington, D.C., often communicate between and among themselves before, during, and after the crime.  They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc.  In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime.  Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation.  Here, based on the investigation to date, there is specific evidence that Bailey communicated with other individuals through social media, accessed through a device, about firearms and illegal narcotics.  The frequent messaging about the sale of pills and controlled substances through the span of over a month leads your Affiant to believe that Bailey uses his devices to facilitate illegal transactions in firearms or controlled substances.

23.     There is probable cause to believe that the Devices contain photographic or video evidence or fruits of the Subject Offenses.  Based on my training and experience, I know that witnesses, and even perpetrators, often record criminal activity.  For example, witnesses have recorded school fights, attacks on public transportation, and police shootings and assaults.  These videos have proven extremely crucial in investigations by depicting the crime itself.  Based on my training and experience, I know that people who possess guns, illegal drugs, unlawfully obtained

money, and other contraband in Washington, D.C., often use their cell phones to capture and store images or video recordings of such contraband – sometimes called "trophy photos." They also often share these images or video recordings with associates using email, text messaging, or other forms of communication on their cell phone such as online social networking services. Similarly, they often refer to their guns, illegal drugs, and other contraband in text messages, emails, or other written communications that are carried out by and stored on their cell phone. These communications, images, and video recordings can be evidence of a perpetrator's prior possession of a weapon or contraband, and of his or her knowledge and intent relating to such possession. Here, there is specific evidence that Bailey films videos of himself with firearms and ammunition using his devices and posts such videos, likely using his devices, on social media. The Devices may also contain evidence of other photographs of Bailey wearing the same clothing he wore in videos in which he has been depicted with firearms or ammunition.

24.     There is probable cause to believe that the Devices contain evidence of Bailey's state of mind and motivation or intent in connection with his commission of the Subject Offenses. For instance, Bailey's Instagram messages show that he communicates with others regarding his plans or arrangements for illegal activity.

## TECHNICAL TERMS

25.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

14

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly

16

available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service

providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire

18

or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

       l.     "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

       m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

       p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an

encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

       q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

26.    Based on my training, experience, and research, I know that the black Apple iPhone model A1660 has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

27.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause

20

to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

    a.    Individuals who engage in criminal activity, including the Subject Offenses, typically interact with others utilizing digital devices, discuss their feelings or plans with others (both coconspirators or likeminded individuals), and may record videos or take pictures to show their efforts and whether they have accomplished their objectives.

    b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

    c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via

21

the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

28.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.

22

Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    b.  Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

**METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

29.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.

Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously

followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined

search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

30.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.    The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

28

c.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

31.   Because the Devices are in MPD custody and forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

32.   I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

James Jacobs
Officer
Metropolitan Police Department


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 8, 2021.


_____
THE HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE